This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-36706**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**LLOYD AGUILAR,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Stan Whitaker, District Judge**

Hector H. Balderas, Attorney General
Eran S. Sharon, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**ATTREP, Judge.**

**{1}** Defendant Lloyd Aguilar appeals his convictions for armed robbery (NMSA 1978, § 30-16-2 (1973)), conspiracy to commit armed robbery (*id.*; NMSA 1978, § 30-28-2 (1979)), three counts of child abuse (intentional without great bodily harm) (NMSA 1978, § 30-6-1(D)(1) (2009)), and tampering with evidence (NMSA 1978, § 30-22-5 (2003)). Defendant argues: (1) he was denied a fair trial because the district court's exclusion of a rebuttal witness foreclosed a line of defense; (2) his child abuse convictions violated his right to be free from double jeopardy; (3) the classification of his child abuse

convictions as serious violent offenses under the Earned Meritorious Deductions Act (EMDA), NMSA 1978, § 33-2-34 (2015), was not supported by substantial evidence; and (4) his right to a speedy trial was violated. We affirm.

**BACKGROUND**

**{2}** After grocery shopping, Tania Salinas and her three children (D.S., Ant. S., and And. S.) were approached in the parking lot by a man asking for money. While Ms. Salinas searched in her purse for change, another man appeared with a gun, cocked it, and held it to Ms. Salinas's forehead. The assailant demanded Ms. Salinas's purse. When she did not immediately give it to him, he grabbed the purse and the two men drove away. All three of Ms. Salinas's children were right next to her and witnessed the assailant threatening their mother with a gun. Numerous witnesses testified that the assailant wore a Chicago Bulls jersey with the number one on it. Later, an attendant at a nearby gas station saw a man wearing the same jersey dispose of a purse in a trash can. The attendant retrieved the purse and gave it to police; it was later determined to be Ms. Salinas's purse.

**{3}** Ms. Salinas identified Defendant as her assailant sometime after the robbery when she saw a photograph of him on the local news. Ms. Salinas then called the detective working the case to tell him that the man she saw on the news was the man who robbed her at gunpoint. Defendant was subsequently charged with the crimes in this case. During trial, Ms. Salinas, her children, eyewitnesses from both the grocery store and the gas station, field officers, and the detective testified. Ms. Salinas and D.S. identified Defendant as the man wearing the Chicago Bulls jersey who robbed Ms. Salinas. Ms. Salinas reviewed still photographs from the gas station surveillance video and testified that the man in the photographs was her assailant. The detective also opined that these photographs depicted Defendant. Defendant's defense was one of mistaken identity arising from poor police procedure and investigation, which ultimately impacted the witnesses' ability to identify the actual perpetrator. Defendant was convicted on all counts and now appeals. We reserve further discussion of the facts for our analysis.

**DISCUSSION**

**I.      Foreclosure of a Line of Defense**

**{4}** Defendant argues that the district court's denial of his request to call a witness to rebut a portion of Ms. Salinas's testimony foreclosed a line of defense. During cross-examination, Ms. Salinas admitted that she was shown a photograph of Defendant by defense counsel during a pretrial interview but did not identify Defendant as her assailant. During redirect, however, Ms. Salinas testified that she recanted her inability to identify Defendant immediately after the interview to then-assistant district attorney Scott Jaworski, telling him that her assailant was the one pictured in Defendant's photograph. Defense counsel later sought to call Mr. Jaworski as a rebuttal witness "to testify that it was not true that Ms. Salinas had told him that [she] had mistakenly failed

to identify [Defendant]'s photograph at the pretrial interview." The State objected and the district court denied Defendant's request, reasoning that Mr. Jaworski was not disclosed on Defendant's witness list.[1]

**{5}** Defendant argues that the district court abused its discretion by denying his request to call Mr. Jaworski as a rebuttal witness. This error was so great, Defendant maintains, that it prejudiced him by foreclosing a line of defense and thereby denied him a fair trial. The State disagrees, responding that Mr. Jaworski's testimony was not relevant because he could not remember such a conversation with Ms. Salinas and that Defendant additionally failed to cross-examine Ms. Salinas on the matter. For the reasons that follow, we conclude the exclusion of Mr. Jaworski was not reversible error.

**{6}** "We review the exclusion of evidence for abuse of discretion. An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Maples*, 2013-NMCA-052, ¶ 13, 300 P.3d 749 (internal quotation marks and citations omitted). "An evidentiary ruling within the discretion of the court will constitute reversible error only upon a showing of an abuse of discretion and a demonstration that the error was prejudicial rather than harmless." *State v. Smith*, 2016-NMSC-007, ¶ 46, 367 P.3d 420 (internal quotation marks and citation omitted).

**{7}** In support of his argument that the district court abused its discretion in excluding Mr. Jaworski, Defendant claims that the ruling denied him the opportunity "to rebut Ms. [Salinas's] claim that she recanted her failure to identify [Defendant as] her assailant." Defense counsel elaborated, during directed verdict, that "[t]he most important point is [Ms. Salinas] told [Mr.] Jaworski she misidentified or made a mistake when she put the 'no' on . . . [Defendant]'s photo and that she told him that. That is an absolute lie." The record, however, does not support this view of Mr. Jaworski's proffered testimony. Defense counsel recorded a telephone interview with Mr. Jaworski on a break during trial after Ms. Salinas had testified, and based on our review of that interview, Mr. Jaworski plainly had no recollection of the conversation with Ms. Salinas. When asked what he discussed with Ms. Salinas after the pretrial interview, Mr. Jaworski stated, "There's no way I remember that" and "I don't know . . . I mean, I would have no idea." And after nearly twenty minutes of prompting, Mr. Jaworski continued to equivocate and would only commit to opining that, hypothetically, he "probably" would disclose a material change to a witness's testimony.

**{8}** Given the nature of Mr. Jaworski's proffered testimony, its probative value as impeachment evidence—i.e., as proof that Ms. Salinas did not in fact recant her failed identification of Defendant at the pretrial interview—seems minimal at best. Under such

---

1We do not review the district court's exclusion of Mr. Jaworski on this ground. The parties have not briefed this issue and, regardless, we may affirm the district court's evidentiary ruling if it is right for any reason. See State v. Astorga, 2015-NMSC-007, ¶ 44, 343 P.3d 1245 ("[W]e may uphold the judge's decision if it was right for any reason." (internal quotation marks and citation omitted)); State v. Patterson, 2017-NMCA-045, ¶ 15, 395 P.3d 543 ("[W]e may affirm if the district court was right for any reason, including proper exclusion under Rule 11-403 [NMRA]." (citation omitted)).

circumstances, we question whether its exclusion constituted error. *See generally* Rule 11-402 NMRA ("Irrelevant evidence is not admissible."); Rule 11-403 (permitting the exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"); *cf., e.g.*, *Astorga*, 2015-NMSC-007, ¶ 40 (observing that in evaluating the admissibility of a prior inconsistent statement under Rule 11-613(B) NMRA, "[t]he question . . . is simply whether the substance of the witness's trial testimony is inconsistent with the prior statement" and even if requirements of Rule 11-613(B) are met, admissibility is "subject to the district court's broad discretion under Rule 11-403" (emphasis omitted)). We, however, need not settle this matter because, as we discuss below, the exclusion did not foreclose a line of defense.

**{9}** Even if we assume the district court erred by excluding Mr. Jaworksi as a rebuttal witness, we must determine whether such exclusion was sufficiently prejudicial to Defendant to constitute harmful error. *State v. Campbell*, 2007-NMCA-051, ¶ 13, 141 N.M. 543, 157 P.3d 722. In particular, "[a] defendant seeking relief because an avenue for his defense was foreclosed by an evidentiary ruling must show that he was prejudiced by the ruling. However, no more prejudice need be shown than that the trial court's order may have made a potential avenue of defense unavailable to the defendant." *Id.* ¶ 14 (alteration, quotation marks, and citation omitted). In *Campbell*, we held that reversible error occurred when the district court excluded expert testimony on the reliability of child sexual abuse allegations because, in that case, there was no other evidence to support the defendant's theory regarding his accuser's veracity. *Id.* ¶¶ 1, 17. No similar circumstances exist in this case.

**{10}** Unlike the defendant in *Campbell*, Defendant had ample opportunity to explore his defense theory of mistaken and tainted identification. Defendant advanced this theory through the cross-examination of the detective, the field officers, and Ms. Salinas, as well as during his case through the examination of Ms. Salinas's children. Nonetheless, Defendant argues that "the trial court's exclusion of Mr. Jaworski's testimony denied [him] the opportunity to discredit the testimony of his accuser." Again, this assertion is not borne out upon a review of the record.

**{11}** When Ms. Salinas testified that she previously recanted her failed identification of Defendant, defense counsel asked only to recross her on the subject of whether she felt pressured or tricked during the interview, which was granted. And while the district court denied Defendant's request to call Mr. Jaworski, the court offered to allow defense counsel to "put [Ms. Salinas] back on the stand and quiz her about [her conversation with Mr. Jaworski] to discredit her, if you wish to do so." Defendant, however, chose not to. What is more, defense counsel presented his theory that Ms. Salinas's recantation was fabricated during closing argument—highlighting to the jury that Ms. Salinas had the opportunity to change her interview answers but never did and that if Ms. Salinas had in fact recanted to Mr. Jaworski, something would have happened to correct her interview statements but nothing did.

**{12}** In sum, Defendant had an opportunity to discredit Ms. Salinas's testimony through cross-examination, but chose not to do so, and was otherwise able to advance his defense theory, notwithstanding the exclusion of rebuttal testimony. On this record, and in light of the nature of the excluded testimony, we cannot say that Defendant was deprived of his right to present a defense by the district court's evidentiary ruling. *See State v. Ervin*, 2008-NMCA-016, ¶ 39, 143 N.M. 493, 177 P.3d 1067 (concluding there was no prejudice when the district court excluded rebuttal testimony because the defendant had an opportunity to develop his theory on cross-examination of the victim, which he chose not to do). We accordingly affirm the district court's decision to exclude Mr. Jaworski.

## II.    Double Jeopardy

**{13}** Defendant argues that his three convictions for child abuse, one for each child, violate double jeopardy. Defendant mounts a unit of prosecution double jeopardy challenge, which we review de novo. *State v. Olsson*, 2014-NMSC-012, ¶ 14, 324 P.3d 1230. Unit of prosecution challenges require a two-step analysis: (1) we review the statutory language for legislative intent as to the unit of prosecution, and (2) if the unit of prosecution is not clear from the statutory language, "we determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *State v. Ramirez*, 2018-NMSC-003, ¶ 47, 409 P.3d 902 (internal quotation marks and citation omitted). "If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the [L]egislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes." *Id.*

**{14}** The first step—as it pertains to the child abuse statute, Section 30-6-1(D)(1)—has been settled by our Supreme Court in *Ramirez*, in which the Court concluded that "the statutory language is ambiguous as to the unit of prosecution." 2018-NMSC-003, ¶ 55. We thus proceed to the second step, reviewing Defendant's acts for indicia of distinctness. *Id.* ¶ 47.

**{15}** To determine whether a defendant's acts are sufficiently distinct, we look to the factors adopted by our Supreme Court in *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624. In particular, we examine the "(1) temporal proximity of the acts; (2) location of the victim during each act; (3) existence of an intervening act; (4) sequencing of the acts; (5) the defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *State v. Garcia*, 2009-NMCA-107, ¶ 10, 147 N.M. 150, 217 P.3d 1048 (citing *Herron*, 1991-NMSC-012, ¶ 15).

**{16}** "[T]he number-of-victims factor has special significance [in this analysis]: Multiple victims will likely give rise to multiple offenses." *Ramirez*, 2018-NMSC-003, ¶ 57 (alteration, internal quotation marks, and citation omitted); *see also State v. Bernal*, 2006-NMSC-050, ¶ 18, 140 N.M. 644, 146 P.3d 289 ("While the existence of multiple victims does not, itself, settle whether conduct is unitary or distinct, it is a strong indicator of legislative intent to punish distinct conduct that can only be overcome by

other factors."). In the context of multiple child abuse charges, this Court has explained the particular significance of multiple victims:

> We further emphasize that a single unit of prosecution in a child abuse case involving multiple victims is only appropriate where the children have not actually been harmed. . . . If actual harm results from child abuse, however, the focus shifts from the actions of the abuser to the result of those actions, and each child harmed is a distinct victim with unique injuries. Under such circumstances, it is entirely appropriate to charge the perpetrator with a separate count of child abuse for each victim.

*State v. Castañeda*, 2001-NMCA-052, ¶ 15, 130 N.M. 679, 30 P.3d 368. Actual harm may include psychological injuries, which can support separate units of prosecution in a child abuse case. *See Ramirez*, 2018-NMSC-003, ¶ 57 (affirming multiple counts of child endangerment where three children sat in the back seats of a vehicle as the defendant fired nine rounds at the children's father in the front passenger seat, and each child testified about the fear, shock, and anguish they experienced); *State v. Trujillo*, 2002-NMCA-100, ¶ 20, 132 N.M. 649, 53 P.3d 909 (recognizing that "there may be instances when the risk of emotional harm from [witnessing an attack on the child's parent] might be sufficient to support a conviction based on endangerment" if the state lays "an adequate evidentiary foundation proving the likelihood of harm to [the] child's emotional health").

**{17}** In this case, Defendant was convicted of three counts of child abuse against D.S., Ant. S., and And. S. for "point[ing] a firearm near [each child]." *See* UJI 14-612 NMRA. As for the majority of the *Herron* factors, there are few indicia of distinctness. The facts established that Defendant held a gun to Ms. Salinas's forehead while D.S., Ant. S., and And. S. watched nearby. The robbery itself appeared to be Defendant's sole objective. Defendant's actions took place over a short period of time while Ms. Salinas and her children stood together in one place. There was no intervening event.

**{18}** Turning to the result of Defendant's actions, we first note that, in line with prior child endangerment cases, the State's theory of the case was that Defendant's actions endangered each child by placing them directly in harm's way, and Defendant does not challenge this aspect of his convictions on appeal. *See, e.g.*, *State v McGruder*, 1997-NMSC-023, ¶ 38, 123 N.M. 302, 940 P.2d 150 (upholding the defendant's child endangerment conviction where the defendant fatally shot mother's boyfriend before threatening to shoot mother, who was standing in front of her child in the line of fire), *abrogated on other grounds by State v. Chavez*, 2009-NMSC-035, 146 N.M. 434, 211 P.3d 891; *State v. Ungarten*, 1993-NMCA-073, ¶¶ 12-13, 115 N.M. 607, 856 P.2d 569 (holding the evidence was sufficient to support the defendant's child endangerment conviction where the defendant brandished a knife at the child's father while the child stood directly behind father, and the child testified that the knife came so close to his body that he "could not discern whether it was directed at him or his father"), *abrogated on other grounds by Chavez*, 2009-NMSC-035. Even though the State's case focused on the risk of physical harm to the children, the State also presented evidence

establishing that the children each suffered distinct psychological harm. D.S. testified that she felt shock, fear, and powerlessness during the robbery. She explained that her family would not talk about what happened because they continued to be afraid after the incident. Ant. S. also testified to being afraid for his mother and for himself. Although And. S did not specifically testify about his feelings during the incident, Ms. Salinas testified that, due to their close proximity, her children "experienced everything" and they were traumatized by the robbery. Ms. Salinas further explained that the family had entered counseling and that the ongoing psychological harm continued to the time of trial.

**{19}** As in *Ramirez*, "[t]his case involved multiple child victims who suffered distinct mental injuries as a consequence of [Defendant]'s actions." 2018-NMSC-003, ¶ 57. The Court in *Ramirez* concluded that such harm to each child, in conjunction with the significant risk of physical harm attendant in the defendant's conduct, provided sufficient facts to conclude the Legislature intended multiple child abuse convictions in that case. *Id.* (noting "[t]he chance that any one of the children might have been struck by one of the bullets fired into and through [their father] increased as the number of shots fired increased"). Defendant attempts to distinguish *Ramirez* solely by emphasizing that the defendant in that case fired multiple shots. While this fact increased the risk of physical harm to each child, it was not dispositive in *Ramirez*, and we reject Defendant's suggestion that his conduct did not also create a risk of physical harm to the children. *See id.* ¶¶ 57-58; *McGruder*, 1997-NMSC-023, ¶ 38; *Ungarten*, 1993-NMCA-073, ¶ 12.

**{20}** As in *Ramirez*, Defendant's actions placed D.S., Ant. S., and And. S. in a situation that endangered their health and safety, and the State presented evidence that Defendant's conduct caused actual harm. Applying the reasoning from *Ramirez* and *Castañeda*, we likewise conclude that Defendant's convictions for three counts of child abuse do not violate double jeopardy.

## III.  Serious Violent Offense

**{21}** Defendant next argues that the district court's designation of his child abuse convictions as serious violent offenses under EMDA, which reduced his ability to earn good time against his sentence, was not supported by sufficient evidence. *See* § 33-2-34(A)(1) (limiting a prisoner's ability to earn meritorious deductions during a term of incarceration for a "serious violent offense"). Based on our review of the record and the argument advanced by Defendant, we detect no error in the district court's designation.

**{22}** Child abuse is listed in Section 33-2-34(L)(4)(o) of EMDA, the discretionary category of offenses that may be classified as a serious violent offense "when the nature of the offense and the resulting harm are such that the court judges the crime to be a serious violent offense." With respect to the "nature of the offense," the district court must determine that the crime was "committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." *State v. Morales*, 2002-NMCA-016, ¶ 16, 131 N.M. 530, 39 P.3d 747, *abrogated on other grounds by State v.*

*Frawley*, 2007-NMSC-057, ¶ 36, 143 N.M. 7, 172 P.3d 144. The district court's designation of a crime as a serious violent offense is within that court's discretion and will be affirmed if supported by substantial evidence. *See State v. Solano*, 2009-NMCA-098, ¶ 7, 146 N.M. 831, 215 P.3d 769 (stating that "a district court abuses its discretion when its decision is not supported by substantial evidence" (internal quotation marks and citation omitted)).

**{23}** In evaluating the district court's determination under EMDA, we "review the facts and circumstances before the trial court." *State v. Montoya*, 2005-NMCA-078, ¶ 9, 137 N.M. 713, 114 P.3d 393. Here, the district court considered the presentence report, Defendant's sentencing memorandum, Defendant's criminal history, Ms. Salinas's statement at the sentencing hearing, and the children's letters to the court; in addition, the district court judge noted that he presided over the jury trial and heard the trial testimony. After considering the foregoing, the district court "determine[d] that the discretionary serious violent offenses of [the three child abuse counts] shall be considered serious violent offenses for purposes of [D]efendant's eligibility for meritorious deductions. The [serious violent offense] designation is based clearly on the impact it had on the children and certainly on Ms. Salinas, shows a substantial serious violent nature of it considering that we are still here with some indication that they are still suffering from that today and shows the kind of substantial impact that it did have on their lives."

**{24}** Defendant maintains that the record does not support the district court's serious violent offense designation, and we focus our analysis accordingly.[2] *See, e.g.*, *Montoya*, 2005-NMCA-078, ¶¶ 9-10 (focusing analysis on whether there was sufficient evidence to support a serious violent offense designation). In particular, Defendant first contends he "committed armed robbery by *threatening* harm; he did not, however, actually *inflict* harm." Defendant, citing *Loretto*, nonetheless stipulates that actual harm under EMDA includes "lasting psychological harm," of which all the children suffered. *See* 2006-NMCA-142, ¶¶ 5, 16 (concluding that mentally impaired child victim who suffered trauma, lapse in learning skills, and paralyzing nightmares was harmed by the defendant within the meaning of EMDA). Here, extensive evidence, both at the trial and at the sentencing hearing, substantiated the children's psychological harm, which resulted from Defendant's intentional acts in committing the armed robbery. *See Solano*, 2009-NMCA-098, ¶ 17 ("[T]he term 'physically violent manner' includes the intentional use of force that results in some harm.").

**{25}** Defendant's next contention—that "[t]here was no evidence of intent to actually inflict harm" nor any "indication that the acts testified to were 'reasonably likely to result

---

[2]Defendant does not argue that the district court's findings were inadequate as a matter of law; and we therefore do not address this issue. See State v. Loretto, 2006-NMCA-142, ¶ 14, 140 N.M. 705, 147 P.3d 1138 (noting the requirement that the district court make adequate findings in support of its serious violent offense designation); State v. Scurry, 2007-NMCA-064, ¶ 4, 141 N.M. 591, 158 P.3d 1034 (reviewing such findings for legal adequacy when challenged by the defendant); see also State v. Fuentes, 2010-NMCA-027, ¶ 29, 147 N.M. 761, 228 P.3d 1181 (noting that we will "not review unclear or undeveloped arguments [that] require us to guess at what [a] part[y's] arguments might be").

in serious harm,' as specified in *Morales*, 2002-NMCA-016, ¶ 16"—is equally unavailing. As this Court observed in *Morales*, "actual 'resulting harm' may be considered in determining a defendant's intent." 2002-NMCA-016, ¶ 16. In this case, the resulting harm experienced by each child was severe and ongoing, as noted by the district court's findings and supported by the record. At the sentencing hearing, Ms. Salinas explained that her children suffered trauma to that day, nearly four years after the incident. The children's letters described the detrimental impact Defendant's actions had on their lives and the significant emotional distress they all continued to experience.

**{26}** Significantly, the circumstances of the armed robbery make the harm the children experienced practically inevitable. In brief, while the children accompanied their mother during a trip to the store, Defendant pointed a gun at Ms. Salinas's head as her children stood closely by, believing their mother or themselves would be killed. Adult witnesses in the parking lot, who were not in Ms. Salinas's immediate proximity nor related to Ms. Salinas, testified to the fear and danger they experienced due to Defendant's acts. That children, "a highly vulnerable population," of the victim of an armed robbery would experience this same or heightened fear and danger and be subjected to ongoing psychological harm is all but certain. *Ramirez*, 2018-NMSC-003, ¶ 54.

**{27}** In light of the manner in which Defendant used the firearm, the proximity of the children, and the actual resulting serious harm to them, "the district court could find that Defendant was a person with knowledge that his acts were reasonably likely to result in serious harm" and that Defendant acted with recklessness in spite of this. *State v. Worrick*, 2006-NMCA-035, ¶ 10, 139 N.M. 247, 131 P.3d 97; *see also id.* ¶¶ 8-14 (concluding that "the district court believed [the d]efendant's actions were reckless in the face of knowledge that [those] acts were reasonably likely to result in serious harm[,]" despite the court not using such verbiage). We, therefore, conclude that substantial evidence supported the designation of Defendant's convictions for child abuse as serious violent offenses and the district court acted within its discretion in determining the same.

## IV. Speedy Trial

**{28}** Finally, we address Defendant's argument that the district court erred in denying his speedy trial motion. Defendant filed his motion to dismiss on speedy trial grounds six months after the indictment in this case; the case was subsequently stayed due to the State's appeal of a suppression order; Defendant renewed his motion after remand, approximately two months before trial. After a comprehensive review of the briefs, the record, the relevant case law, and the thorough district court order, we adopt the reasoning of the district court's order dated February 22, 2017, except as stated herein, and address Defendant's claims of error only briefly. Further, we do not go through the procedural history underlying Defendant's speedy trial claim as the relevant facts are known to the parties and set forth in the district court's order.

**{29}** In determining whether a defendant has been deprived of the right to a speedy trial, we analyze the four factors set out by the United States Supreme Court in *Barker*

*v. Wingo,* 407 U.S. 514 (1972): "(1) the length of delay in bringing the case to trial, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant caused by the delay." *State v. Serros*, 2016-NMSC-008, ¶ 5, 366 P.3d 1121. In analyzing the *Barker* factors, "we give deference to the district court's factual findings, but we review the weighing and the balancing of the *Barker* factors de novo." *State v. Spearman*, 2012-NMSC-023, ¶ 19, 283 P.3d 272 (alterations, internal quotation marks, and citation omitted).

## A.      Length of Delay

**{30}**     As for the length of delay, the parties agree that this was an intermediate case and that the total delay was approximately three years, well past the presumptively prejudicial period. *See, e.g., State v. Garza*, 2009-NMSC-038, ¶¶ 2, 23, 146 N.M. 499, 212 P.3d 387 (deeming fifteen months in an intermediate case the threshold at which further inquiry into the *Barker* factors is warranted). The district court weighed the length of delay moderately against the State, and Defendant has not challenged this determination on appeal. We therefore proceed to the second *Barker* factor. *See State v. Duttle*, 2017-NMCA-001, ¶ 15, 387 P.3d 885 ("For this Court to rule on an inadequately briefed constitutional issue would essentially require it to do the work on behalf of [the d]efendant."); *see also State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031, 1037 (explaining that appellate courts do not review unclear or undeveloped arguments).

## B.      Reasons for Delay

**{31}**     The majority of the delay in this case was occasioned by an appeal taken by the State. Defendant joined his co-defendant's motion to suppress, which the district court granted. The State appealed the suppression order, and this Court affirmed in *State v. Tafoya*, No. 34,218, memo. op. (N.M. Ct. App. May 28, 2015) (non-precedential), with mandate issuing nearly two years after the State's appeal. Defendant argues the district court erred in determining this approximately two-year period weighed only "slightly against the State." Citing *State v. Suskiewich*, 2016-NMCA-004, 363 P.3d 1247, Defendant argues that the State's appeal in this case was "clearly frivolous" and, as such, the resulting delay should have weighed heavily against the State.

**{32}**     Relying on *United States v. Loud Hawk*, 474 U.S. 302 (1986), *Suskiewich* set out the considerations to review when deciding whether the delay occasioned by the state's appeal of a suppression order should weigh against the state.

> In *Loud Hawk*, the Supreme Court held that an interlocutory appeal by the [g]overnment ordinarily is a valid reason that justifies delay. However, a delay resulting from an appeal would weigh heavily against the [g]overnment if the issue were clearly tangential or frivolous. When reviewing whether a delay caused by an appeal is justified, we may consider the strength of the [g]overnment's position on the appealed

issue, the importance of the issue in the posture of the case, and—in some cases—the seriousness of the crime.

*Suskiewich*, 2016-NMCA-004, ¶ 19 (internal quotation marks and citations omitted). In short, a defendant must "show that the appeal was brought in 'bad faith' or for a 'dilatory purpose' " for the delay to weigh against the state in this context. *State v. Flores*, 2015-NMCA-081, ¶ 29, 355 P.3d 81 (quoting *Loud Hawk*, 474 U.S. at 316).

**{33}** Defendant does not directly address the considerations set out in *Loud Hawk* but instead summarizes this Court's ruling on the State's appeal in *Tafoya*, No. 34,218. Defendant seems to contend that because this Court determined the State failed to establish prejudice and disposed of the State's appeal on our summary calendar, the appeal must have been frivolous. However, losing an appeal is not dispositive of the reasonableness of the state's actions. *See Suskiewich*, 2016-NMCA-004, ¶ 23 (concluding, notwithstanding the fact that the state's appeal was dismissed as untimely, "that the [s]tate's appeal of [the suppression] decision addressed a question of law that was not frivolous" and therefore the period during which the state's appeal was pending "does not weigh against either party"); *Flores*, 2015-NMCA-081, ¶ 29 (weighing delay due to the state's appeal neutrally and noting that "[a]lthough this Court ultimately affirmed the district court's order on the basis that the evidence sought to be suppressed would have been more prejudicial than probative, it concluded that the district court had erred in part when it found that the evidence was not relevant"). And our review of the record does not indicate the State's appeal was clearly frivolous.[3] Although this Court affirmed the district court's suppression order, *Tafoya*, No. 34,218, memo. op. ¶ 7, we nevertheless concluded that the district court had committed error, *id.* ¶ 2. Based on the record before us, we agree with the district court's determination that "there is no indication that the State's appeal of the suppression of certain critical evidence was frivolous or done for the purpose of delaying the progression of this matter."

**{34}** We thus conclude that this period of delay should be weighed neutrally.[4] Further, Defendant did not challenge the district court's additional determinations that the

_____

3Our review is limited to the memorandum opinion in *Tafoya*, No. 34,218, which includes no discussion intimating the State's appeal was clearly frivolous. The record does not contain the co-defendant's motion to suppress of which Defendant joined, the suppression hearing, or the State's docketing statement on appeal. *See State v. Rojo*, 1999-NMSC-001, ¶ 53, 126 N.M. 438, 971 P.2d 829 ("Where there is a doubtful or deficient record, every presumption must be indulged by the reviewing court in favor of the correctness and regularity of the trial court's judgment." (alteration, internal quotation marks, and citation omitted)).

4The district court weighed this period of delay slightly against the State, noting that the delay was administrative, which should be weighed against the State, and citing case law for the proposition that tolerance for such delay "varies inversely with its protractedness." *See, e.g., Garza*, 2009-NMSC-038, ¶ 26 (internal quotation marks and citation omitted). In this particular context, however, our case law supports a determination that this period should weigh neutrally, not slightly against the State, in the absence of a showing consistent with the considerations in *Loud Hawk. See, e.g., Suskiewich*, 2016-NMCA-004, ¶ 23; *Flores*, 2015-NMCA-081, ¶ 29. Nevertheless, even if we were to conclude this period should weigh slightly against the State, as the district court did, for the reasons that follow, Defendant's speedy trial claim still fails.

periods before and after the State's appeal, approximating one year in total, weighed neutrally. And we find no error in these rulings.

## C.    Assertion of the Right

**{35}**    As for the assertion of the right, the district court determined that Defendant's pro forma speedy trial assertion and his motion to dismiss were "sufficient[] to have this factor weigh in his favor." Defendant does not contend this was error, and upon our review of the record, we agree with the district court. *See State v. Ochoa*, 2017-NMSC-031, ¶ 41, 406 P.3d 505 ("Pro forma assertions are sufficient to assert the right, but are given little weight in a defendant's favor."); *State v. Moreno*, 2010-NMCA-044, ¶ 35, 148 N.M. 253, 233 P.3d 782 (concluding that the assertion factor weighs only slightly in favor of the defendant when he asserted his right once pro forma, and in a motion to dismiss two and one-half months prior to trial).

## D.    Prejudice

**{36}**    "The heart of the right to a speedy trial is preventing prejudice to the accused." *Garza*, 2009-NMSC-038, ¶ 12. To determine if a defendant was prejudiced as a result of the delay, we consider whether there was (1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3) impairment of Defendant's defense. *See id.* Generally, it is the defendant's burden to "make a particularized showing of prejudice to demonstrate a violation of any of the three interests." *State v. Samora*, 2016-NMSC-031, ¶ 21, 387 P.3d 230.

**{37}**    Defendant points only to the second category of prejudice and argues, in total, that "[w]hile it is true that [Defendant] conceded that his actual prejudice from the anxiety and concern caused by the delay in this case was relatively light, to permit a relatively weak showing of prejudice to override the other *Barker* factors would be to deprive the other factors of much of their constitutional significance and to deprive [Defendant] of justice." Defendant cites no legal authority in support of this proposition. And to the contrary, our Supreme Court has made clear that, unless the other *Barker* factors weigh heavily in a defendant's favor, "a defendant must show particularized prejudice of the kind against which the speedy trial right is intended to protect." *Garza*, 2009-NMSC-038, ¶ 39. Defendant has attempted to make no such showing here, and we thus agree with the district court that "Defendant has failed to establish he has suffered any actual prejudice as a result of the delay in bringing his case to trial."

## E.    Balancing the Factors

**{38}**    Finding none of Defendant's arguments persuasive, and concluding the district court did not err in its speedy trial analysis, we agree with the district court's determination that, upon balancing the *Barker* factors, Defendant's right to a speedy trial was not violated. *See Garza*, 2009-NMSC-038, ¶ 40 (holding that because "[the d]efendant failed to demonstrate particularized prejudice" and "the other factors do not

weigh heavily in [the d]efendant's favor[,]" the defendant's right to a speedy trial was not violated).

**{39}** We affirm the district court's denial of Defendant's speedy trial motion.

**CONCLUSION**

**{40}** For the foregoing reasons, we affirm.

**{41}** **IT IS SO ORDERED.**

**JENNIFER L. ATTREP, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**BRIANA H. ZAMORA, Judge**